UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Biotronik, Inc. and Biotronik SE & Co. KG<br><br>Plaintiffs,<br><br>v.<br><br>Niazi Patent Holdings, LLC,<br><br>Defendant. | Case No. 25-cv-1739<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DECLARATORY JUDGEMENT OF NON-INFRINGEMENT**

Plaintiffs Biotronik SE & Co. KG ("Biotronik KG") and Biotronik, Inc. ("BINC") (collectively, "Biotronik" or "Plaintiffs") file this Complaint for Declaratory Judgment of Non-Infringement, and in support of their Complaint allege as follows:

**NATURE OF THE ACTION**

1. This is an action for declaratory judgment of non-infringement of U.S. Patent No. RE50,170 (the "'170 patent," attached as **Exhibit 1**) against Defendant Niazi Patent Holdings, LLC ("Defendant" or "NPH") arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the patent laws of the United States, 35 U.S.C. §§ 1 et seq.

2. Biotronik KG has been a pioneer in the design and manufacture of cardiac rhythm management devices, including pacemakers, defibrillators, and cardiac resynchronization therapy ("CRT") devices, for more than six decades. Since its founding in Germany in 1963, Biotronik KG has developed innovative and purpose-driven healthcare technology that saves and improves the lives of millions each year. BINC is a leading medical device and technology enterprise, focusing on innovation and development in the areas of cardiac rhythm management and electrophysiology. BINC has been doing business in the United States since 1979.

1

3. On March 10, 2017, the inventor of the '170 patent, Dr. Imran Niazi, filed a complaint against BINC in the Western District of Wisconsin (Case No. 17-cv-185), alleging that BINC's Selectra catheter infringed another of his patents, U.S. Patent No. 6,638,268 (the "'268 patent"). Around the same time, Dr. Niazi filed similar suits against St. Jude Medical S.C., Inc. (Case No. 17-cv-183), Boston Scientific Corp. (Case No. 17-cv-184), and Medtronic, Inc. (Case No. 17-cv-283). On November 7, 2017, the district court dismissed all four cases for improper venue. *See, e.g.*, *Niazi v. Biotronik, Inc.*, Case No. 17-cv-185, Dkt. 24. Dr. Niazi, acting through a licensing company, refiled his cases against the other three defendants in the District of Minnesota, but he did not refile his case against BINC. *See Niazi Licensing Corporation v. Boston Scientific Corp.*, Case No. 17-cv-5094 (D. Minn. 2017), *Niazi Licensing Corporation v. Medtronic, Inc.*, Case No. 17-cv-5095 (D. Minn. 2017), *Niazi Licensing Corporation v. St. Jude Medical S.C., Inc.*, Case No. 17-cv-5096 (D. Minn. 2017).

4. On or about June 18, 2024, Dr. Niazi contacted the President of BINC to discuss potential licensing of the '268 patent. After another call with the President of BINC, Dr. Niazi proposed that further discussions take place between his and BINC's counsel. Over several months, they exchanged emails and participated in videoconferences related to the '268 patent. On September 27, 2024, Dr. Niazi's counsel shared a claim chart purporting to demonstrate infringement of the '268 patent by BINC.

5. Subsequently, in December 2024, BINC and Dr. Niazi's licensing company for the '268 patent, Niazi Licensing Corporation ("NLC"), executed a Confidentiality Agreement "in order to protect BINC's CONFIDENTIAL INFORMATION" during their subsequent discussions relating to the '268 patent. Thereafter, the parties conducted further discussions. Then, on May

8, 2025, Dr. Niazi's attorney sent BINC a proposed agreement relating to the '268 patent. **Ex. 2** at 1 (May 8, 2025 email entitled "Agreement for the '268 patent").

6. In his May 8 email regarding the proposed agreement for the '268 patent, Dr. Niazi's counsel for the first time also raised the '170 patent. He alleged that "[s]everal of Biotronik's devices (such as the Amvia Edge, Acticor, Rivacor, Illivia [sic] Neo, and Intica Neo devices) fall within the scope of these claims [of the '170 patent]." He invited BINC to "have a discussion . . . regarding this ['170] patent." *See id.*

7. BINC denied NPH's assertion that the '170 patent was relevant to BINC's products and requested that NPH provide claim charts showing why it contends that BINC's products practice the claims of the '170 patent. BINC also communicated that a non-disclosure agreement ("NDA") covering this additional patent would be necessary.

8. Dr. Niazi's counsel responded on June 6, 2025, by sending to BINC a set of two claim charts containing allegations that BINC's Acticor, Rivacor, Ilivia Neo, Intica Neo, and Amvia Edge products (the "Accused Products") infringe claims 1, 3, 5, 22-24 of the '170 patent. **Exs. 3 and 4** ("2025.06.06 Claim Chart (Acticor Rivacor Ilivia Neo Intica Neo)" and "2025.06.06 Claim Chart (Amvia Edge)"). Dr. Niazi's counsel also conveyed Dr. Niazi's interest "in ongoing payments over the remaining term of the ['170] patent rather than a lump sum." Following the delivery of these claim charts and Dr. Niazi's demand for "ongoing payments," BINC again requested an NDA with NPH.

9. At the beginning of July 2025, Dr. Niazi's counsel provided an initial draft of a Confidentiality Agreement (the "Agreement"), which was executed about one week later. Like the earlier agreement between BINC and NLC that protected BINC's confidential and proprietary information shared with NLC during discussions related to the '268 patent, this Agreement was

also executed "in order to protect BINC's CONFIDENTIAL INFORMATION" exchanged with NPH.[1]  **Ex. 5** at 1 (preamble).

10.     Like the earlier confidential agreement BINC had with NLC, this Agreement with NPH prevents NPH from disclosing any "CONFIDENTIAL INFORMATION" as defined in the Agreement, but imposes no symmetric obligation on BINC. *See id.* at 1 (¶¶ 1-2). The parties also agreed that "evidence of conduct or statements made in the course of any discussions under this Agreement (*except the fact that such discussions occurred*) shall be inadmissible in any proceeding for any purpose," but ostensibly carved out one particular use of such evidence, which is to prove "the fact that such discussions occurred."  *See id.* at 2 (¶ 6) (emphasis added).

11.     After the Agreement was fully executed and returned to BINC, the parties conducted an initial videoconference on July 15, 2025. That was followed by a second videoconference on August 20, 2025, in which Dr. Niazi participated.

12.     After the second videoconference, BINC reiterated its position that it did not need a license to the '170 patent. BINC emphasized that "Biotronik's devices pace in a conventional manner that predates the ['170] patent."  **Ex. 6** at 1-2 (August 26, 2025 email entitled "NPH Call Follow-Up [25.062A]"). BINC also restated its position that, "for the reasons [it] discussed on the call, and others, [it] believe[d] that the patent's claims are invalid and not infringed by Biotronik's products."  *See id.*  If NPH and Dr. Niazi, nevertheless, continued to assert that BINC needed to license the '170 patent, BINC requested from NPH additional support for NPH's infringement allegations before BINC would consider them further.

---

[1] NLC was Dr. Niazi's licensing entity for the '268 patent, while NPH was his licensing entity for the '170 patent.

13. Almost one month later, NPH's counsel responded with "an updated claim chart along with some additional technical analysis from Dr. Niazi." **Ex. 6** at 1. Although the updated claim chart was "directed to the Amvia Edge," he explained that "the analysis also applies to the other [accused] devices (Acticro [sic], Rivacor, Ilivia Neo, and Intica Neo)." He again invited Biotronik to "schedule a call to discuss." *Id.* at 1; **Exs. 7 and 8** ("2025.09.24 Claim Chart (Amvia Edge) UPDATED" and "Niazi Analysis - Biotronik"). The updated claim chart continued to allege infringement of claims 1, 3, 5, 22-24 and added new allegations that claims 2, 7, 11-13, and 29-30 were infringed by the Accused Products. *See* **Ex. 7**.

14. Biotronik denies that any of its products infringe the '170 patent. Given NPH's allegations of infringement, detailed in multiple claim charts and accompanied by Dr. Niazi's technical analysis, an actual and justiciable controversy regarding infringement of the '170 patent exists between Biotronik and NPH.

## PARTIES

15. Plaintiff Biotronik SE & Co. KG ("Biotronik KG") is a privately-held German company with its principal place of business at Woermannkehre 1, 12359 Berlin, Germany. Under German corporate law, an "SE & Co. KG" is a limited liability partnership ("Kommanditgesellschaft"). Biotronik KG has more than 2,000 employees in Germany.

16. Plaintiff Biotronik, Inc. ("BINC") is a Delaware corporation with its principal place of business at 6024 Jean Road, Lake Oswego, Oregon 97035. BINC, first established in 1979, has 546 employees in the United States.

17. On information and belief, Defendant Niazi Patent Holdings, LLC ("NPH") is a Wisconsin domestic limited liability company organized and existing under the laws of Wisconsin, with its principal office at 9080 N. Upper River Rd., River Hills, Wisconsin 53217.

18. On information and belief, Defendant NPH is the current owner of all right, title, and interest in the '170 patent, including the right to sue for past damages.

## JURISDICTION AND VENUE

19. This action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and under the patent laws of the United States, Title 35 of the United States Code.

20. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

21. Pursuant to 28 U.S.C. § 2201, this Court can provide the declaratory relief sought in Biotronik's Complaint because an actual case or controversy exists between Biotronik and NPH. An actual case or controversy exists at least because Biotronik does not infringe and has not infringed any claim of the '170 patent, and NPH has accused Biotronik's pacemaker, implantable cardioverter defibrillator ("ICD"), and cardiac resynchronization therapy ("CRT") devices, including the Accused Products, of infringing the '170 patent.

22. The Court has personal jurisdiction over the Defendant at least because NPH is a company that, upon information and belief, is incorporated in Wisconsin and maintains its principal place of business in Wisconsin, and because of NPH's continuous and systematic contacts with the State of Wisconsin.

23. Venue is proper in this judicial district under 28 U.S.C. § 1391, at least because the Eastern District of Wisconsin is the judicial district where the Defendant resides. Upon information and belief, NPH is incorporated in Wisconsin, has its registered agent in Menominee Falls, Wisconsin, and maintains its principal place of business in River Hills, Wisconsin.

## FIRST COUNT
**(Declaration of Non-infringement of U.S. Patent No. RE50,170)**

24. Biotronik restates and incorporates by reference the allegations in paragraphs 1 through 23 of this Complaint as if fully set forth herein.

25. The Defendant Niazi Patent Holdings, LLC claims to own all rights, title, and interest in and under the '170 patent. The '170 patent is titled "Summation anodal pacing to complement multisite stimulation." The '170 patent is a reissue of U.S. Patent No. 8,838,237 (the "'237 patent"). The '237 patent was originally filed on March 22, 2011, and issued on September 16, 2014. The '170 reissue application was filed on July 2, 2021, and reissued on October 15, 2024. The '170 patent lists Imran K. Niazi as the sole inventor of the patent and the Defendant Niazi Patent Holdings, LLC as the sole assignee. The '170 patent reissued with 32 claims. Claims 1-21 of the '170 patent are identical to the original claims 1-21 of the '237 patent. Claims 22-32 of the '170 patent are newly added claims. A true and correct copy of the '170 patent is attached hereto as **Exhibit 1**, and a true and correct copy of the '237 patent is attached hereto as **Exhibit 9**.

26. Biotronik does not directly or indirectly infringe any claim of the '170 patent, either literally or under the doctrine of equivalents.

27. For example, claim 22 of the '170 patent recites: "A device for applying an electrical current to a heart, the device comprising: a current source; a plurality of leads which are connected to the current source, wherein the leads include first, second, and third leads that are connectable to a right atrium of a heart, a right ventricle of the heart, and a left ventricle of the heart, respectively; wherein each of the leads has at least one electrode and at least the third lead has at least two electrodes, wherein at least one of the electrodes serves as a cathode and at least one of the electrodes serves as an anode, wherein a surface area of at least one of the electrodes is sized sufficiently small to cause anodal capture, wherein the current source is controlled to deliver

7

solely cathodal stimulation to at least one electrode, wherein at least one other electrode is a return electrode, wherein the stimulation creates an area of hyper-polarization of the myocardial cell membrane and resultant anodal capture of a portion of the heart via the return electrode, wherein the return electrode is a pacing electrode, and wherein cathodal stimulation is simultaneous with anodal capture that occurs solely as a consequence of the cathodal stimulation of another electrode."

28. Claim 22 requires that the "the third lead," which is "connectable to . . . a left ventricle of the heart," have "at least two electrodes," one of which "serves as a cathode" and another one of which "serves as an anode." Biotronik's pacemakers, ICDs, and CRT devices, including the Accused Products, do not meet this claim limitation when made, used, sold, offered for sale, or imported. At least some of Biotronik's pacemakers, ICDs, and CRT devices, including at least some of the Accused Products, are compatible with a variety of left ventricle leads, including leads that do not have more than one electrode. Even when used with a left ventricle lead having more than one electrode, Biotronik's pacemakers, ICDs, and CRT devices, including the Accused Products, can be configured in many different ways, including ways in which no electrode on the left ventricle lead serves as an anode.

29. Claim 22 also requires the occurrence of "anodal capture that occurs solely as a consequence of the cathodal stimulation of another electrode." Biotronik's pacemakers, ICDs, and CRT devices, including the Accused Products, do not meet this claim limitation when made, used, sold, offered for sale, or imported. Anodal capture is a physical response of the patient's heart to pacing therapy provided by a pacemaker, ICD, or CRT device; it is not a property of a pacemaker, ICD, or CRT device, such as the Accused Products, and it cannot occur until a device is implanted in a patient, configured, and engaged. And the properties of a pacemaker, ICD, or CRT device,

8

such as the Accused Products, do not by themselves determine whether anodal capture will occur. That is dependent on other factors, including the physician's choice of leads, the precise location of the leads when implanted, the configuration of the settings of the pacemaker, ICD, or CRT device, and physiological factors unique to each patient, such as the health of the patient's heart tissue.

30. Biotronik has not directly infringed and does not directly infringe claim 22 by making, using, selling, offering for sale, or importing its pacemakers, ICDs, and CRT devices, including the Accused Products, because those products do not meet the limitations of claim 22 when made, used, sold, offered for sale, or imported.

31. Biotronik has not contributed, and does not contribute, to infringement of claim 22 at least because Biotronik's pacemakers, ICDs, and CRT devices, including the Accused Products, are not especially made or especially adapted for use in an infringement of claim 22 and have substantial noninfringing uses. As explained above, at least some of Biotronik's pacemakers, ICDs and CRT devices, including at least some of the Accused Products, are compatible with and, on information and belief, are regularly used with left ventricle leads that do not have more than electrode, and even when used with left ventricle leads having more than one electrode, Biotronik's pacemakers, ICDs and CRT devices, including the Accused Products, can be configured, and, on information and belief, are regularly configured, such that no electrode on the left ventricle lead serves as an anode. Furthermore, Biotronik's pacemakers, ICDs, and CRT devices, including the Accused Products, can be and, on information and belief, are regularly implanted, configured, and operated such that no anodal capture occurs.

32. Biotronik has not actively induced, and does not actively induce, infringement of claim 22 at least because Biotronik does not instruct, encourage, or otherwise take action to cause

physicians to implant, configure, and operate its pacemakers, ICDs, and CRT devices, including the Accused Products, in ways that infringe claim 22.  In particular, Biotronik does not instruct, encourage, or otherwise take action to cause physicians to implant, configure, and operate its pacemakers, ICDs, and CRT devices, including the Accused Products, such that anodal capture occurs.

33. For another example, claim 29 of the '170 patent recites: "A method of cardiac pacing, the method comprising the steps of: coupling first, second, and third leads to a right atrium of a heart, a right ventricle of a heart, and a left ventricle of the heart, respectively, wherein each of the first and second leads has at least one electrode and at the third lead has at least two electrodes; delivering solely cathodal stimulus current to at least one electrode wherein at least one other electrode is a return electrode and the stimulus creates an area of depolarization of one part of the myocardial cell membrane and resultant cathodal stimulation and hyper-polarization of another part the myocardial cell membrane and resultant anodal capture of a portion of the heart via the return electrode, wherein the return electrode is a pacing electrode, wherein the cathodal stimulation and the anodal capture of the portion of the heart as a result of stimulation are simultaneous and the anodal capture occurs solely as a consequence of the cathodal stimulation of another electrode, and wherein the stimulus current is delivered to the electrodes at different times."

34. In addition to the reasons that Biotronik does not directly or indirectly infringe claim 22, which apply equally to claim 29, Biotronik does not directly infringe claim 29 because Biotronik itself does not perform the steps of the patented method or cause any third party to perform the steps of the patented method under its direction or control.  Biotronik's pacemakers, ICDs, and CRT devices, including the Accused Products, are implanted, configured, and operated

under the direction or control of an independent physician whose actions cannot be imputed to Biotronik.

35. In view of the foregoing, Biotronik seeks a judicial declaration that Biotronik does not directly or indirectly infringe any claim of the '170 patent, including by its manufacture, use, importation, sale, and offer for sale of pacemakers, ICDs, and CRT devices, including the Accused Products.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Biotronik demands judgment as follows:

A. Declaring that judgment be entered in favor of Biotronik against NPH on Biotronik's claims;

B. Declaring that Biotronik does not infringe, directly or indirectly, the '170 patent, either literally or under the doctrine of equivalents;

C. Declaring that Biotronik does not induce infringement of the '170 patent;

D. Declaring that Biotronik does not contribute to infringement of the '170 patent;

E. Finding that this is an exceptional case under 35 U.S.C. § 285;

F. Awarding Biotronik its costs and attorneys' fees in connection with this action;

G. Awarding Biotronik such further and additional relief as the Court deems just, equitable, and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Biotronik respectfully demands a trial by jury on all issues so triable.

Dated: November 6, 2025　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Sanjiv Laud*

Sanjiv P. Laud (0395115)
Lucien Wang (54755)
MCCURDY LAUD, LLC
400 S. 4th St., Suite 401, #31
Minneapolis, MN 55415
(612) 699-0545 Telephone
sanjiv@mccurdylaud.com
lucien@mccurdylaud.com

Hanna R. Kolberg (1067382)
VON BRIESEN & ROPER, S.C.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
(414) 287-1248 Telephone
hanna.kolberg@vonbriesen.com

***Attorneys for Plaintiffs Biotronik, Inc. and Biotronik SE & Co. KG***